**ST. JOE PAPER COMPANY,**
Appellant,

v.

**HARTFORD ACCIDENT AND INDEM-
NITY COMPANY et al., Appellees.**

No. 22129.

United States Court of Appeals
Fifth Circuit.

May 3, 1966.

Chester Bedell, C. Harris Dittmar, Robert P. Smith, Jr., Jacksonville, Fla., Bedell, Bedell, Dittmar & Smith, Jacksonville, Fla., of counsel, for appellant.

Gerald Bard Tjoflat, Jacksonville, Fla., Mahoney, Hadlow, Chambers & Adams, Jacksonville, Fla., of counsel, for Fidelity and Casualty Co. of New York.

Charles Cook Howell, Jr., William M. Howell, Jacksonville, Fla., Howell, Dawson, Galant, Maddox & Sulik, Jacksonville, Fla., of counsel, for Hartford Accident and Indemnity Co.

Before PHILLIPS,* RIVES, and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge:

Suit was brought on two fidelity insurance policies of substantially identical provisions, issued for different periods by different companies to the same employer. Trial to a jury resulted in a general verdict for both defendants and there was judgment accordingly. We affirm.

I

The policy issued by the Hartford Accident and Indemnity Company was for the term beginning August 5, 1959, and expiring August 5, 1960. The loss claimed against this policy amounted to $49,137.61. The policy issued by the Fidelity & Casualty Company of New York was for the period elapsing between August 5, 1960, and February 16, 1961, with an alleged loss of $36,941.

The policies agreed to indemnify the plaintiff against any *loss of money* which it should sustain "through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others".

While, as above stated, there were two policies issued by different companies for

---

* Of the Tenth Circuit, sitting by designation.

different periods, appellant says in its brief that each policy, in nearly identical language, contained the following provisions:

1. "The coverage * * * shall not apply * * * from and after the time that the Insured or any partner or officer thereof not in collusion with such Employee shall have knowledge or information that such Employee has committed any fraudulent or dishonest act in the service of the Insured or otherwise, whether such act be committed before or after the date of the employment by the insured";

2. "This Bond shall be deemed cancelled as to any Employee: (a) immediately upon discovery by the Insured, or by any partner or officer thereof not in collusion with such Employee, of any fraudulent or dishonest act on the part of such Employee."

II

The prelude to this law suit ran for nearly five years. The alleged infidelity was a two year continuation in a second company of that which had already been going on for three years while the employee in question was working for the prior owner. The telling of the tale consumed 805 pages of written record in the district court. Obviously, we must condense to the bare essentials those facts which the jury could have believed in arriving at its verdict.

Thus condensed, this is what happened: In 1956, Ft. Wayne Corrugated Paper Company, with headquarters in Ft. Wayne, Indiana, was engaged in the manufacture and sale of corrugated paperboard and cartons. It wanted and needed more and better business, particularly at its mill in McKee's Rocks, Pennsylvania, usually referred to as its Pittsburgh division. Robert M. Jones was manager at McKee's Rocks and had been in that capacity since 1950. Prior to that time, he had been sales manager for Ft. Wayne in the Pittsburgh division.

The Anchor Hocking Glass Company, with general offices located in Lancaster, Ohio, was a heavy consumer of cardboard boxes. Ft. Wayne had not done business with Anchor Hocking for about eighteen years. These companies had once been involved in litigation, which ended their business relationship.

In the first part of 1956, Jones went to the president of Ft. Wayne, who had served in that capacity since 1942, with a plan by which he thought a highly advantageous contract could be secured from Anchor Hocking for the purchase of products manufactured at McKee's Rocks. At this point Paul Dickmeyer was vice president and treasurer of Ft. Wayne, immediately answerable to the president, and was also the immediate superior of Jones. Jones told the president that in order to get the business from Anchor Hocking "a commission would have to be paid on this contract". This was positively contrary to company policy, as it maintained its own salesmen. At the outset, Jones suggested that "we pay it and pass it under the table". The president promptly rejected this but did agree to pay the commission if Jones could "figure out a way to do it". Jones then conceived the idea of setting up a fictitious sales agency, identified only as the Box Sales Agency, Post Office Box 145, Lancaster, Ohio, *being the same city in which Anchor Hocking maintained its headquarters*. The president instructed Dickmeyer to have the plan checked out with company accountants. The report was satisfactory, the plan was approved, and the extremely valuable new business was obtained in the form of a two year contract. No officer or employee of Ft. Wayne except Jones had anything to do with acquiring or negotiating the contract. The president remarked that, "this is better than any glass business we have. How in the world do you work it?" Jones answered, "you know there is something we will have to come up with". Except for the identity of the actual recipient of the commissions, the arrangement involving the fictitious sales agency was explained to the presi-

dent. As to who constituted the fictitious agency, and as to who was really getting the money, the president said that he did not want to know anything about it, and his wishes were obeyed. When the first contract came to expiration date in 1958, Jones, and Jones alone, then negotiated and obtained a new contract, known in the trade as an "evergreen contract", for two years certain and thereafter to be terminated only upon ninety days notice by either party. But at that time Jones informed the president that the commission theretofore paid would have to be raised to four per cent. With a minimum of protest and with no explanation required, the raise was agreed to.

The instant suit was brought by St. Joe on account of that same commission arrangement, which it unabatedly and uninterruptedly continued after it took over, the circumstances of which will now be related.

On June 15, 1959, St. Joe Paper Company, plaintiff-appellant, acquired, along with other property, the McKee's Rocks mill. It retained Dickmeyer as the immediate superior of Jones, and Jones was continued in his same position as manager. Dickmeyer had known, from the very beginning, of the existence of the commission arrangment. Like the president of Ft. Wayne, he had not known who was actually or ultimately getting the money.

We think the proof furnished ample evidence from which the jury could have believed, as its verdict indicates it did believe, that St. Joe almost immediately knew as much about this fictitious sales agency arrangement as its predecessor had known.

Before the new company took over, its comptroller audited the books of Ft. Wayne. He was told by the president of the prior company about the payment of the commissions to Box Sales Agency. The contract with Anchor Hocking was described. As to the payment of the commission, at various points in the conversation with the comptroller the president said that "there was something special about this * * * the terms weren't written in the contract * * * but a commission was being paid for the business".

On the day St. Joe took over, Dickmeyer told its president and vice president what he knew about the commission situation, including the original proposition that payment be made under the table. He told these new officers that it was "a fictitious set up that we have established to pay. We are charging a commission on the business. It is holding the business for us. It is being used * * * to maintain the business. * * * I don't like it, but I want to know whether you want to continue it". The President of St. Joe then and there directed that the commission payments be continued. Dickmeyer went to Pittsburgh and informed Jones of this decision.

This is in stark contrast with the undisputed fact that anytime it had wished to do so St. Joe, upon perfunctory inquiry, could have found out that Box Sales Agency had no office, had no telephone, had no known principals, and had no correspondence with either the sellers or the buyers here involved.

All of the foregoing, of course, transpired before Hartford issued the first policy dated August 5, 1959.

Some two or three months after St. Joe took over, Jones spoke with one of its executives about the possibility of acquiring some new business from Anchor Hocking for another mill owned by St. Joe but not in Jones' territory. The executive was told that if St. Joe wanted this business it would have to pay the same 4% commission. The matter was settled by direction of a vice president to "take the business and pay the commission".

Within a few months after St. Joe became the new owner, at least before January 1, 1960, officers of the new owner began to wonder whether Box Sales Agency might not be a set up by which Anchor Hocking was getting a kick-back in the form of reduced cost of merchandise or else some of its employees might

be using the power of his office for personal benefit. Attorneys were consulted and Dickmeyer was sent personally to Pittsburgh to obtain a letter from Jones, the essential contents of which he, in effect, dictated. Dickmeyer told Jones "that they were afraid of a - - - they were [in] some doubt as to whether there would be a possible Robinson-Patman [15 U.S.C.A., Section 13] violation and they needed this letter, and he told me what he would like me to put in the letter in my own words and construction". Dickmeyer told Jones to put the letter in his own handwriting, not to have it typed by a secretary, and that he did not want anybody in the office to know about it. On January 21, 1960, the letter was written.[1]

The letter was soon delivered into the hands of the company president, who directed that it be locked up and preserved in a safe in his office. The commission checks continued to flow to Box Sales Agency, with no questions asked.

In late 1960, things got really gummed up. Through the inadvertency of someone, two of the commission checks were mailed directly to personnel in the purchasing office of Anchor Hocking. Jones retrieved the checks and wrote the company treasurer to get the checks in the future and send them directly to the post office box in Lancaster. The receipt of this letter caused a high level company conference in which it was decided to find out who had actually been receiving the commissions.

A routine bank inquiry speedily turned up the fact that Jones, who had set up the Sales Agency arrangement, was the man who had deposited all commission checks in a bank in Ohio and thereafter withdrew the funds and deposited them to his personal bank account in Pennsylvania. The proof showed that Jones paid personal income tax on the money, and he testified at the trial, without contradiction, that he used the money in playing customer gin rummy, where the customer wins, and in lavish entertainment of high customer officials.

After St. Joe made this discovery, two additional commission checks were sent and cashed. In less than two months, however, Jones was discharged and this suit was brought.

### III

The insurers contend that the new company deliberately continued to pay the commissions in order to get the business, and fully got what it paid for, therefore it suffered no loss. At the same time, however, as the district judge so ably charged below, an employee who occupies a position of trust and confidence is obligated to exercise the utmost good faith in all matters which are entrusted to him by his employer, during which time he may not make a secret profit out of transactions in which he acts for his employer. The jury was specifically charged that if such an employee wilfully violates such a position of trust and confidence, for example by concealments or misrepresentations which are not known to the employer, then such violation shows a want of integrity, which may be regarded as a fraudulent or dishonest act [within the

---

1. "January 21, 1960

Mr. R. E. Bartlett
Vice President, St. Joe Paper Company
Barnett Bank Building
Jacksonville, Florida

Dear Mr. Bartlett:

At the request of Mr. Dickmeyer I I have been asked to write and give you information concerning the officials of Box Sales Agency.

In my relationship with the Box Sales Agency, I have not, up until this time, personally met any official or representative that I knew to be part of or member of Box Sales Agency. Nor do I know that any officer or member of Box Sales Agency is an officer or employee of Anchor-Hocking Glass Corp.

The dealings which I have had with Box Sales Agency have been in an anonymous manner and have been necessary in order to obtain certain sales advantages in my dealings with Anchor-Hocking Glass Corp. The commissions have been paid to help obtain these sales advantages.

Very truly yours,
ROBERT M. JONES"

meaning of the insurance policies here sued upon].

These charges correctly state the law. While it may be that the jury believed the testimony of Jones that he made no secret profit from these transactions, the proof does show beyond dispute that Jones never at any time before February 1961, revealed that he got the commission checks and ultimately deposited the proceeds in his personal bank account. We, therefore, expressly decline to affirm the judgment on this ground.

The jury was further charged, however, as follows:

"The defendants further allege that before the relevant date of coverage of the insurance policies, plaintiff, or one or more of its officers not in collusion with Jones, had knowledge or information of the acts of Jones on which plaintiff bases its claim. Such knowledge or information would bar recovery under either of the policies".

█ This charge was necessitated by the policy language set out in the beginning of this opinion. Without further restatement or analysis, we simply hold that the proof herein set forth was more than ample to support a finding by the jury that prior to the inception of these policies, St. Joe Paper Company came into the possession of both information and knowledge that Jones had committed a dishonesty which, under the recited terms of the policies, barred recovery.

The trial court, therefore, committed no error in denying motions by the plaintiff-appellant for a directed verdict, for judgment notwithstanding the verdict, and for a new trial.

█ Appellant assigns error also in the giving of the following instruction:

"Therefore, if you find from the evidence that prior to August 5, 1960, St. Joe Paper Company knew through one or more of its officers or one or more of its officers were informed that Box Sales Agency performed no services in connection with the sale of containers from St. Joe Paper Company to Anchor Hocking Glass Corporation, and that all or a part of the commissions were being transmitted to Jones or to Anchor Hocking Glass Corporation or to persons connected with Anchor Hocking Glass Corporation, and that, notwithstanding such knowledge or information, St. Joe Paper Company continued to pay such commissions, then you must return a verdict for defendants."

This instruction comprehends a correct statement of the law.

"If, with the consent of the employer, expressed or implied from the course of dealings between it and the employee, the latter used or retained monies, charging itself with them, it would be no obligation covered by the insurance or indemnity of the (surety) company", Monongahela Coal Co. v. Fidelity and Deposit Co., 5 Cir., 1899, 94 F. 732.

Undisputed evidence shows that both companies not only consented to the Box Sales Agency arrangement but went out of their way to avoid finding out how the money was used or who was actually getting it. They knew that Jones, and Jones alone, set up the arrangement and handled all contacts with Anchor Hocking. Jones' testimony that the money went to Anchor Hocking officials in the form of gin rummy and lavish entertainment, whether actually true or not, stands undisputed in this record. The testimony showed that St. Joe was told from the outset that Jones set up Box Sales and that it was fictitious. It necessarily followed that either Jones was keeping the commissions or transmitting them in some manner to Anchor Hocking or some of its officers. St. Joe was getting the business. Flying in the face of repeated warnings, it studiously chose not to learn the answer until February, 1961. There would have been ample ground for a jury finding that the company impliedly consented to whatever was being done with the funds. Since there was a general verdict we do not know what, if anything, the jury found on this particular issue. The law and the evidence justified the granting of the

instruction and we can see no basis for holding it to have been reversible error. We note that prior to trial the court struck certain defenses involving this same issue. This does not change the fact that the evidence as adduced by the parties, under the supervision of the court, developed this issue and the defendants were entitled to have it submitted to the jury.

We have carefully considered the other contentions of appellant as to the reception of proof, instructions, and like matters, in which we find no cause for reversal.

The Judgment of the District Court is affirmed.